MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2016 ME 52
Docket:        Yor-15-238
Argued:        November 3, 2015
Decided:       April 12, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
               HUMPHREY, JJ.

## GUARDIANSHIP OF AUBREE THAYER

JABAR, J.

[¶1]  The father of Aubree Thayer appeals from a judgment of the York County Probate Court (*Longley, J.*)[1] awarding a limited guardianship of Aubree to her maternal grandmother pursuant to 18-A M.R.S. § 5-204(d) (2015).  The father primarily challenges the court's determination that he demonstrated a lack of consistent participation in Aubree's life.  We are satisfied that the evidence supports the court's conclusions that the father demonstrated a lack of consistent participation by failing to consistently care for and support Aubree, and that the father remained unable to care for Aubree at the time of the hearing on the petition. We affirm the judgment.

### I.  BACKGROUND

[¶2]  The following findings of fact made by the trial court are supported by competent evidence in the record.  When the mother became pregnant with

---

[1]  The case was heard on judicial interchange pursuant to 4 M.R.S. § 306 (2015).

Aubree, she was living with the father in Colorado. The young couple was not able to support a child on their own, and the mother soon returned to Maine to finish her pregnancy in the home of the maternal grandparents. The father remained in Colorado, where he was on probation for drug-related crimes. Due to the terms of his probation, the father was able to visit Aubree only twice during the first nine months of her life.

[¶3] In February 2014, when Aubree was nine months old, the father moved to Maine. For the next month, the father lived with the mother and Aubree in the home of the maternal grandparents and received parenting instruction from the maternal grandparents. During this time, the father participated in caring for Aubree only occasionally, and only when prompted, while the mother and the maternal grandparents continued to share equal responsibility for Aubree's care.

[¶4] In May 2014, approximately two months after the father left Aubree in the care of her mother and maternal grandparents, Aubree's mother died of a heroin overdose. Throughout the following summer, the maternal grandparents provided nearly all of Aubree's care and support,[2] while the father maintained an irresponsible existence that consisted of drinking; smoking marijuana; and, at times, driving while under the influence with Aubree in the vehicle. During this

---

[2] The father did take Aubree to spend the weekends with her paternal grandparents.

period, the father admitted that he did not know how to care for Aubree and that he thought the maternal grandparents were "far better for [her]."

[¶5]  In August 2014, after an argument with the maternal grandfather, the father removed Aubree from the maternal grandparents' care.  The maternal grandparents then petitioned for coguardianship of Aubree.  *See* 18-A M.R.S. § 5-204 (2015).  In support of their petition, the maternal grandparents alleged that the father had never provided direct care for Aubree; had maintained only limited contact with her; and was unable to care for her or provide her with a stable, drug-free home.  The petitioners claimed that the father had demonstrated a lack of consistent participation in Aubree's life within the meaning of 18-A M.R.S. § 5-204(d); they did not assert that he had created a temporarily intolerable living situation within the meaning of 18-A M.R.S. § 5-204(c).

[¶6]  While the petition was pending, the father allowed Aubree's health issues to worsen through neglect.  When Aubree developed a cough, the father neglected her symptoms for several weeks before taking her to see a doctor; in the meantime, Aubree's condition worsened into an ear and sinus infection.  After taking Aubree from the maternal grandparents' home, the father continued to demonstrate limited job-retention skills and failed to secure stable, independent housing for himself and his daughter.  At the time of the hearing, the father remained without a permanent home.  He claimed that he and Aubree sometimes

4

stayed with his parents and sometimes stayed with his aunt. In these homes, the father fed Aubree and changed her diapers when others were not available to do so.

[¶7] In March 2015, after a testimonial hearing, the court entered a judgment granting the petition for Aubree's guardianship as to the maternal grandmother and denying it as to the maternal grandfather. The court determined that the father had demonstrated a lack of consistent participation with Aubree within the meaning of section 5-204(d) by engaging in a pattern of substance abuse that rendered him unable to consistently meet Aubree's needs. The court also explained its decision by stating that the father "has ongoing needs and issues that currently render [him] unable to meet the physical, mental and emotional health and developmental needs of his child and to keep her out of harm's way. This father simply is not yet able to meet the child's needs." (Footnote omitted). The court determined that Aubree's best interest would be served by the appointment of the maternal grandmother as a limited guardian, reasoning that the father and the maternal grandmother had demonstrated an ongoing ability to work together, while the father and the maternal grandfather had not. In structuring and limiting the guardianship, the court required the maternal grandmother to assist the father in the acquisition of parenting skills, to prioritize and ensure Aubree's regular contact and visitation with the father, and to honor the prospect of Aubree living with the

father once he acquired the ability to meet her needs. *See* 18-A M.R.S. §§ 5-105, 5-213 (2015).

[¶8]  The father timely moved for further findings of fact and conclusions of law, and to alter or amend the judgment. *See* M.R. Prob. P. 52, 59; *see also* M.R. Civ. P. 52, 59.  In so doing, he argued that the court, in determining whether there was a demonstrated lack of consistent participation, had failed to make adequate findings regarding the factors enumerated in 18-A M.R.S. § 5-101(1-C) (2015). He also asserted that the petition could not be granted because the evidence did not suggest that he was currently demonstrating a lack of consistent participation.

[¶9]  In April 2015, the court entered an order making further findings and conclusions, emphasizing that it had applied a high standard of proof to the grandparents' petition and found the facts supporting its decision upon the basis of highly credible evidence.  The court clarified that the maternal grandparents qualified as "de facto guardians" within the meaning of section 5-204(d) because Aubree had resided with them for fifteen months, during which time the father had demonstrated a lack of consistent participation by chronically abusing substances and failing to maintain stable employment or independent housing, while depending upon the maternal grandparents to provide the majority of Aubree's care and support.  The court determined that this behavior reflected a failure by the father to recognize Aubree's needs, and a failure to comply with the "duties

imposed upon a parent by the parent-child relationship, including but not limited to, providing the child necessary food, clothing, shelter, health care, education, a nurturing and consistent relationship and other care and control necessary for the child's physical, mental and emotional health and development."

[¶10]  Although the court appeared to interpret section 5-204(d) to require the maternal grandparents to show a lack of consistent parental participation only during the time that the child resided with them, the court's explanation of its determination of parental unfitness referred not only to the father's actions during the time that Aubree was living with her grandparents, but also to his actions during the months when Aubree was primarily in his care.  The court explicitly found that the father's actions had continued to harm Aubree after he removed her from the maternal grandparents' care.  Specifically, the court found that the father had "subjected Aubree to his bouncing around lifestyle" and delayed in "getting the child the immediate medical treatment that her worsening infections required." Correctly reflecting the necessity of assessing the father's "current" parental fitness, the court concluded that the "father's actions dramatically, and even traumatically, affect his young and very dependent child's well-being."

[¶11]  The father timely appealed to us.  *See* 18-A M.R.S. § 1-308 (2015); M.R. App. P. 2(b)(3).

## II. DISCUSSION

[¶12]  On appeal, the father primarily contends that the court erred in interpreting the de facto guardian statute and violated his fundamental rights by granting the petition.[3]  He argues that the element of a lack of consistent participation must be interpreted to allow the appointment of a guardian only (1) when a parent's physical absence threatens the welfare of a child and (2) when that physical absence exists at the time that the petition is being considered.  He asserts that this bright-line construction is both compelled by the language of the statute and necessary to protect the fundamental rights at stake.  We disagree with his assertion concerning the requirement of a parent's physical absence, but do agree that the parent's lack of consistent participation—i.e., the parent's unfitness—must exist at the time the petition is being considered.

[¶13]  Statutory construction is a question of law that we consider de novo.  *Guardianship of Jewel M.* (*Jewel I*), 2010 ME 17, ¶ 10, 989 A.2d 726.  "In

---

[3]  At oral argument, the father argued that the court violated his right to procedural due process by employing, without notice, the legal standard applicable to guardianship proceedings brought pursuant to 18-A M.R.S. § 5-204(c) (2015).  We reject this contention as a mischaracterization of the court's analysis.

In determining the nature of the parental deficiency that constitutes a lack of consistent participation, the court looked to our decisions explicating the meaning of section 5-204(c).  The court appropriately looked to this related body of law in deciding, without prior guidance from us, the meaning of 18-A M.R.S. § 5-204(d) (2015), and it then proceeded to apply the standard set by section 5-204(d) to the evidence presented at trial.  There is no indication that the father lacked notice of the nature of the allegations against him.  Although the evidence might have supported the imposition of a guardianship based upon a temporarily intolerable living situation, the maternal grandparents did not assert section 5-204(c) as an alternative basis for their petition.

interpreting a statute, we first examine the plain meaning of the statutory language seeking to give effect to the legislative intent . . . ." *Guardianship of Zachary Z.*, 677 A.2d 550, 552 (Me. 1996) (quotation marks omitted). We also "consider the provision at issue in light of the entire relevant statutory scheme" in order to arrive at a harmonious result. *Adoption of Tobias D.* (*Tobias D.*), 2012 ME 45, ¶ 15, 40 A.3d 990. We consider an alleged constitutional violation de novo, as a matter of law, but confine our review of a statute's application to the facts in the case before us. *Rideout v. Riendeau*, 2000 ME 198, ¶¶ 14-15, 761 A.2d 291.

A.    A Lack of Consistent Participation

[¶14]   Pursuant to 18-A M.R.S. § 5-204(d), a Probate Court may appoint a guardian for a child if the petitioner establishes, by clear and convincing evidence, that "there is a de facto guardian and a demonstrated lack of consistent participation by the nonconsenting parent," and that the appointment of the de facto guardian is in the child's best interest.[4]  *See Guardianship of Chamberlain*, 2015 ME 76, ¶ 33, 118 A.3d 229 (interpreting section 5-204(d) to require proof by clear and convincing evidence).

---

[4]  The text of section 18-A M.R.S. § 5-204(d) provides in relevant part:

> The court may appoint a guardian . . . for an unmarried minor if . . . [the parents or the legal custodian of the minor] do not consent, but the court finds by a preponderance of the evidence that there is a de facto guardian and a demonstrated lack of consistent participation by the nonconsenting parent or legal custodian of the unmarried minor. The court may appoint the de facto guardian as guardian if the appointment is in the best interest of the child.

[¶15]   Title 18-A M.R.S. § 5-101(1-C) defines "[d]emonstrated lack of consistent participation" as a

> refusal or failure to comply with the duties imposed upon a parent by the parent-child relationship, including but not limited to providing the child necessary food, clothing, shelter, health care, education, a nurturing and consistent relationship and other care and control necessary for the child's physical, mental and emotional health and development.

The statute further requires that the court consider "at least the following factors" in determining whether a petitioner has shown that a parent has demonstrated a lack of consistent participation:

> **(a)** The intent of the parent . . . in placing the child with the person petitioning as a de facto guardian;
>
> **(b)** The amount of involvement the parent . . . had with the child during the parent's . . . absence;
>
> **(c)** The facts and circumstances of the parent's . . . absence;
>
> **(d)** The parent's . . . refusal to comply with conditions for retaining custody set forth in any previous court orders; and
>
> **(e)** Whether the nonconsenting parent . . . was previously prevented from participating in the child's life as a result of domestic violence or child abuse or neglect.

18-A M.R.S. § 5-101(1-C).

[¶16]  Section 5-101(1-C) thus mandates the court's consideration of at least five specific criteria in a proceeding for guardianship pursuant to section 5-204(d). The father asserts that these statutory factors establish that a lack of consistent

participation can be demonstrated only during periods when the child's parent is physically "absent." We disagree.

[¶17] The criteria in subsection 1-C constitute a nonexhaustive framework for the court's analysis of the evidence in a particular proceeding. The factors must be considered at a minimum, but do not establish a definitive test for application of the demonstrated lack of consistent participation element. The criteria are instead itemized considerations that, if relevant in a given case, inform the ultimate determination of whether the nonconsenting parent refused or failed to comply with the duties imposed upon the parent by the parent-child relationship.

[¶18] As defined by the Legislature, parental duties include, but are not limited to, "providing the child necessary food, clothing, shelter, health care, education, a nurturing and consistent relationship and other care and control necessary for the child's physical, mental and emotional health and development." 18-A M.R.S. § 5-101(1-C). Providing for a child's physical, mental, and emotional needs is a multifaceted responsibility that necessarily requires some degree of active, hands-on involvement in the child's life. *See Pitts v. Moore*, 2014 ME 59, ¶ 28, 90 A.3d 1169 (distinguishing between "parenting functions" that benefit but do not necessarily involve direct contact with a child and "caretaking functions" that involve direct participation in a child's daily care, in discussing the elements of de facto parenthood). To read section 5-101(1-C) as the

father recommends would render superfluous the list of active parental functions that the Legislature apparently considered when contemplating the obligations that bind a parent to his child. Based on the plain language of the statute, we conclude that a lack of consistent participation is demonstrated by a parent's failure or refusal to meet his parental obligations. Although such neglect may be shown by a parent's physical absence, it is not necessarily restricted to that circumstance.

B.    Timeframe

[¶19]    Having examined the type of parental conduct that statutorily qualifies as a lack of consistent participation, we now consider the timeframe within which that conduct must occur in order for a petitioner to prevail on a claim for de facto guardianship. Section 5-101(1-C) defines the conduct that constitutes a demonstrated lack of participation, but does not define the timeframe within which that conduct must occur. However, the definition of de facto guardian provides that the parent's lack of consistent participation must occur at a certain time in order for the petitioner to qualify as a de facto guardian. 18-A M.R.S. § 5-101(1-B) (2015). In relevant part, section 5-101(1-B) defines a de facto guardian as a person with whom a child, if under the age of three, has resided for a period of at least six months, which need not be consecutive, of the twenty-four months immediately preceding the filing of the petition, "and during which period

there has been a demonstrated lack of consistent participation by the parent." 18-A M.R.S. § 5-101(1-B)(a).

[¶20]  The text of section 5-101(1-B) tethers the temporal scope of a period of a lack of consistent participation to the "applicable period"—the timeframe, dependent upon the child's age, that the child must reside with an individual in order for that individual to qualify as a de facto guardian.  As in this case, when the child is under the age of three at the time the petition is filed, the applicable period of residency must total at least six of the twenty-four months immediately preceding the filing of the petition.  18-A M.R.S. § 5-101(1-B)(a).

[¶21]  The father contends that, even if we decide that the plain language of section 5-204(d) does not require a petitioner to prove a "current" lack of consistent participation by the nonconsenting parent, the statute must be interpreted and applied in a manner that imposes a "current" requirement on the lack of consistent participation element in order to provide adequate protection for a parent's fundamental rights.  Before addressing this contention in the context of the facts found by the trial court, we discuss the fundamental nature of the rights implicated by a contested guardianship proceeding and the substantive safeguards that must attend those rights.

[¶22]  Like all parents, the father has a fundamental liberty interest in the care, custody, and control of his child that is entitled to constitutional protection.

*Pitts*, 2014 ME 59, ¶ 11, 90 A.3d 1169. The government may interfere with this familial relationship only through procedures that satisfy the rigors of the Due Process Clause, which necessarily include the establishment of a compelling government interest related to the welfare of the child. *Id.* ¶ 12; *Guardianship of Jewel M.* (*Jewel II*), 2010 ME 80, ¶ 4, 2 A.3d 301. Out of deference to the importance of the fundamental interest at stake, "we have limited the State's intrusions into the parent-child relationship to those instances in which there is some urgent reason or there are exceptional circumstances affecting the child that justify the intrusion." *Pitts*, 2014 ME 59, ¶ 12, 90 A.3d 1169 (footnote omitted).

[¶23] In a proceeding for guardianship pursuant to 18-A M.R.S. § 5-204(c) based upon an allegation that a parent has created a temporarily intolerable living situation, "proof of parental unfitness is a required element to support the establishment of a guardianship over the parent's objection." *Jewel I*, 2010 ME 17, ¶ 12, 989 A.2d 726. The standard for unfitness is less stringent in guardianship proceedings than in proceedings to terminate parental rights because a guardianship is not permanent, but both types of cases interfere with a protected interest in liberty. *See id.* ¶ 13; *In re Amberley D.*, 2001 ME 87, ¶ 23, 775 A.2d 1158. We have accordingly held that section 5-204(c)'s requirement of a temporarily intolerable living situation can only be satisfied by proof that "the parent is currently unable to meet the child's needs and that inability will have an

effect on the child's well-being that may be dramatic, and even traumatic, if the child lives with the parent." *Jewel I*, 2010 ME 17, ¶ 13, 989 A.2d 726.

[¶24] As we indicated in *In re Krystal S.*, the court's obligation in a contested guardianship proceeding is to determine whether the child's parent is fit to care for the child at the time of the hearing. 584 A.2d 672, 674 (Me. 1991); *see also Guardianship of Jeremiah T.*, 2009 ME 74, ¶ 28, 976 A.2d 955 (mandating consideration of a parent's current fitness in a guardianship termination case).

[¶25] Section 5-204(d) authorizes the appointment of a guardian over the objection of a parent, and must accordingly be interpreted to require a showing of parental unfitness that may dramatically and even traumatically affect the child's well-being if the child lives with the parent. *See Jewel I*, 2010 ME 17, ¶¶ 12-13, 989 A.2d 726. Section 5-204(d) establishes a parent's "lack of consistent participation" as the type of parental deficiency that may justify the appointment of a de facto guardian as a child's guardian. Because a lack of consistent participation must, as a matter of due process, relate to a parent's current unfitness, we conclude that element may be satisfied only by proof that the parent is, at the time of the hearing on the guardianship petition, unable or unwilling to care for the child, and that the parent's inability or unwillingness to parent may dramatically and even traumatically affect the child's welfare if the child remains with the parent. *See Jewel I*, 2010 ME 17, ¶ 13, 989 A.2d 726.

[¶26]   The concept of parental duties, as defined by section 5-101(1-C), plainly includes a parental obligation to meet a child's basic needs for food, shelter, and health care—needs that, if unmet, are likely to seriously harm the child. *See* Laurence D. Houlgate, *The Child and the State: A Normative Theory of Juvenile Rights* 112 (1980) (distinguishing between needs that are "basic" and those that are not).  Where a parent demonstrates an ongoing inability to meet the child's basic needs at the time of the hearing on the petition, parental unfitness is established and section 5-204(d) permits state intervention in the parent-child relationship without offense to fundamental parental rights.  *See Tobias D.,* 2012 ME 45, ¶ 22, 40 A.3d 990 (suggesting that a parent may be unfit if "he is unable or unwilling to ensure that the child's basic needs are met").

[¶27]   Here, the court correctly and appropriately considered both the father's past actions and his recent actions in determining that he is currently unfit. The court found that the father demonstrated a lack of consistent participation in Aubree's life during the time that she lived with the maternal grandparents, and that the father remained unable to care for Aubree at the time of the hearing on the petition.  As we discussed above, a careful review of the evidence in this matter confirms these findings in a manner that validates the court's ultimate decision to grant the petition.  *See In re K.M.*, 2015 ME 79, ¶ 9, 118 A.3d 812 (per curiam) (explaining that when the applicable standard of proof is clear and convincing

evidence, "we examine whether the trial court could have reasonably been persuaded on the basis of evidence in the record that the required factual findings were highly probable" (quotation marks omitted)). We conclude that the court's well-supported findings provide a sufficient basis for the court's conclusion that the father has demonstrated an historical and ongoing inability to meet Aubree's basic needs. This failure constitutes a lack of consistent participation that threatens Aubree's welfare, and is consequently sufficient to support the appointment of the maternal grandmother as Aubree's guardian.[5]

[¶28] In this case, the court granted the maternal grandmother a limited guardianship. As we recently noted in *Guardianship of Doe*, 2016 ME 29, ¶ 19, --- A.3d ---, when it did so, the court was required to specify "the duties and powers of the guardian, as required [by 18-A M.R.S. § 5-105], and the parental rights and responsibilities retained by the parent of the minor" pursuant to 18-A M.R.S. § 5-204. Here, the court specified that the father retained the right to have regular telephonic and in-person contact with Aubree, including overnight visits. The court also specified that the father retained the right to have access to

---

[5] We do not discuss the father's contentions that the court erroneously awarded the guardianship without first requiring the maternal grandparents to exhaust the remedy provided by the Grandparents Visitation Act, 19-A M.R.S. §§ 1801-1805 (2015). The record here does not suggest that a domestic relations matter was proceeding in the District Court at the same time that the Probate Court considered the petition for guardianship. *Cf. Guardianship of Jewel M.* (*Jewel II*), 2010 ME 80, ¶¶ 50-51, 2 A.3d 301. Moreover, we agree with the court's determination that an award of grandparent visitation would not have met Aubree's need for safety and stability. *See id.* ¶ 51.

all of Aubree's medical, educational, and extracurricular records; retained the right to participate in medical decision-making; and retained "all remaining parental rights and responsibilities" not specifically allocated to the guardian.

## III. CONCLUSION

[¶29] With the guardianship in place, Aubree will benefit from the stability that her maternal grandmother has consistently afforded her. In addition, because the court has specified the respective rights and obligations of the maternal grandmother and the father, we expect that they will work together for the benefit of the child they both love.

The entry is:

> Judgment affirmed.

---

**On the briefs:**

> Tara A. Rich, Esq., Libby O'Brien Kingsley & Champion, Kennebunk, for appellant father

> Heather T. Whiting, Esq., and Michael T. Devine, Esq., Drummond & Drummond, LLP, Portland, for appellee maternal grandmother

**At oral argument:**

> Tara A. Rich, Esq., for appellant father

> Heather T. Whiting, Esq., for appellees maternal grandmother